UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**LUKA KARADZIC,**

Plaintiff,

v.

**ANDREA M. GACKI**, *in her official capacity as Director, Office of Foreign Assets Control*, *et al.*,

Defendants.

Case No. 1:21-cv-03019 (TNM)

**MEMORANDUM OPINION**

In 2003, the Treasury's Office of Foreign Assets Control (OFAC) sanctioned Luka Karadzic for supporting his brother, Radovan Karadzic, the former President of the Bosnian Serb Republic. Several years ago, Luka asked OFAC to remove those sanctions because, he said, the reasons it sanctioned him no longer applied. OFAC refused. So Luka now sues OFAC and its Director (collectively, OFAC), claiming that its refusal was arbitrary and capricious. Both parties filed motions for summary judgment. The Court finds that OFAC's refusal was not arbitrary and capricious because it permissibly relied on Luka's past actions to maintain its sanctions. More, Luka has recently made statements in support of his brother that justify continued sanctions. The Court will grant OFAC's motion and will deny Luka's cross-motion.

**I.**

OFAC derives its authority to impose sanctions from several statutes and executive orders. In the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701 *et seq*, Congress gave the President authority to "deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national

security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." *Id.* § 1701(a). If the President declares this national emergency, IEEPA permits him to investigate and freeze any property interest a foreign national has in property subject to the jurisdiction of the United States. *See id*. § 1702(a)(1)(B).

Following the conflict in the Balkans in the 1990s, President George W. Bush declared a national emergency and issued Executive Order 13219 (EO 13219). *See* 66 Fed. Reg. 34777 (June 26, 2001). EO 13219 addressed "persons engaged in, or assisting, sponsoring, or supporting, (i) extremist violence in . . . the Western Balkans region, or (ii) acts obstructing implementation of the Dayton Accords in Bosnia or United Nations Security Council Resolution 1244 of June 10, 1999, in Kosovo[.]" *Id.* The actions of these individuals, the executive order said, "constitute an unusual and extraordinary threat to the national security and foreign policy of the United States." *Id.* EO 13219 blocked "all property and interests in property" of those individuals listed in the order and any other persons designated by OFAC in consultation with the Secretary of State. *Id.* § 1.

Two years later, President Bush issued Executive Order 13304 (EO 13304). *See* 68 Fed. Reg. 32313 (May 28, 2003). EO 13304 included a new list of sanctioned individuals and revised the criteria for designating sanctioned individuals. *See id.* §§ 2–3. The order allows OFAC to sanction someone found "to have actively obstructed, or [who] pose[s] a significant risk of actively obstructing . . . the Dayton Accords or the Conclusions of the Peace Implementation Conference held in London on December 8–9, 1995." *Id.* § 3.

The Treasury delegated to OFAC its authority under EO 13219 and EO 13304. *See* 31 C.F.R. § 588.802. Sanctioned individuals are known as Specially Designated Nationals and

Blocked Persons (SDNs). *See* Defs.' Mot. for Summ. J. (Defs.' Mem.) at 10, ECF No. 7-1.[1] OFAC adds designated individuals to a so-called SDN List. *Id.* A designated individual may seek his removal from the SDN List by "assert[ing] that the circumstances resulting in the designation no longer apply." 31 C.F.R. § 501.807. The individual "may submit arguments or evidence that the person believes establishes that insufficient basis exists for the designation." *Id.* § 501.807(a). After conducting a review, OFAC "will provide a written decision to the blocked person." *Id.* § 501.807(d).

EO 13304 includes the Karadzic brothers in its list of sanctioned individuals. Admin. Rec. (AR) at 2, ECF No. 13. Radovan was a founding member and President of the Serbian Democratic Party, President of the Serbian Republic of Bosnia and Herzegovina, and Supreme Commander of its armed forces until his resignation in 1996. *Id.* at 13–14. He "was an advocate for and actively pursued the creation of an ethnically pure geographic region." *Id.* at 14. The International Criminal Tribunal for the former Yugoslavia (ICTY) indicted Radovan in 1995 on two counts of genocide, but he evaded arrest and lived in hiding until 2008. *Id.* Along with Radovan, OFAC designated several members of his family, including Luka, largely for their support of Radovan. *See* Defs.' Mem. at 11; Compl. ¶¶ 13–14, ECF No. 1.

In 2018, Luka petitioned for his removal from the SDN List. *See* AR at 37–38. He claimed that he "had nothing to do with the crimes for which his brother was convicted and has never been charged with any crimes arising out of the war in the former Yugoslavia." *Id.* at 38. He noted that authorities apprehended and imprisoned his brother over a decade ago, so the reason for placing him on the list no longer applied. *Id.*

[1] All page numbers refer to the pagination generated by the Court's CM/ECF filing system.

In response, OFAC sent Luka several requests for information. *See id.* at 39–44. Through counsel, Luka answered each request. *See id.* at 45–47. He claimed that he provided no support to Radovan while Radovan was in hiding. *Id.* at 46. In response to a request about his employment activities, Luka said that in the past he had "leased gas stations." *Id.* After investigating, OFAC pointed to open source information that showed Luka had "leased several gas stations from Jugopetrol, which served as one of the main channels of Radovan Karadzic's money supply during his time in hiding." *Id.* at 142. OFAC requested information about the gas stations and asked Luka for any evidence he could provide to rebut the open source information. *Id.*

Luka replied he had been a share owner of the gas company Komotko since 2000. *Id.* at 144. He claimed Komotko was not profitable because of the sanctions. *Id.* He reasserted that he did not provide any money to Radovan before, during, or after this business venture. *Id.* Luka's counsel argued in the letter transmitting Luka's responses that "the more pertinent question OFAC should consider is whether the circumstances resulting in his designation in 2003 continue to apply in 2021. We contend that even if OFAC decides to credit the rumors that Luka Karadzic helped his brother evade arrest some 20 years ago, there is no reason to maintain the sanctions against him in 2021." *Id.* at 150–51.

OFAC then issued its final determination. *Id.* at 2–3. After stating that it engaged in interagency consultation and considered all the materials Luka submitted, it found that Luka "continues to meet the criteria for designation" and "has not presented credible evidence that the circumstances resulting in his designation no longer apply." *Id.* at 2. Among other justifications for its decision, OFAC cited a 2003 decision by the High Representative to Bosnia and Herzegovina finding that Luka helped "indicted war criminals evade arrest." *Id.* It noted that the

High Representative called out Luka for "being a part of Radovan Karadzic's support network." *Id.* More, OFAC found that Luka either had or posed a significant risk of obstructing the Dayton Accords or the Conclusions of the Peace Implementation Conference Council held in London in 1995. *Id.* Finally, OFAC highlighted Luka's public pronouncements that the Hague Tribunal that convicted Radovan was "illegitimate and illegal" and used "false proof [and] fake witnesses." *Id.* at 2–3. These claims, OFAC said, challenged the "credibility of international institutions that contribute to the regional stability." *Id.* at 3.

Luka then sued. OFAC moved for summary-judgment, and Luka cross-moved for summary judgment. The motions are now ripe.[2]

**II.**

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). This means that "[t]he entire case on review is a question of law." *Id.* (cleaned up).

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency action is arbitrary and

---

[2] Because this case arises under IEEPA, the Court possesses federal question jurisdiction. *See* 28 U.S.C. § 1331; *see also* Compl. ¶ 4 (asserting federal question jurisdiction).

capricious when "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

"[I]f [] OFAC's actions were not arbitrary and capricious and were based on substantial evidence," the Court must uphold its decision. *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003). "Once assured the [agency] has engaged in reasoned decisionmaking, it is not for [the Court] to reweigh the conflicting evidence or otherwise to substitute [its] judgment for that of the [agency]." *Ind. Mun. Power Agency v. FERC,* 56 F.3d 247, 254 (D.C. Cir. 1995); *see also Pub. Citizen Health Res. Grp. v. Tyson,* 796 F.2d 1479, 1495 (D.C. Cir. 1986) ("Our function . . . is only to search for *substantial* evidence, not proof positive. Furthermore, we do not reweigh the evidence and come to our own conclusion; rather, we assess the reasonableness of [the agency's] conclusion.").

## III.

Luka advances three arguments: (1) That OFAC used the wrong legal standard, Pl.'s Cross-Mot. for Summ. J. (Pl.'s Mem.) at 16–23, ECF No. 8-1; (2) that OFAC's decision was arbitrary and capricious on the facts, *id.* at 23–26; and (3) that OFAC violated its own regulations in refusing to remove him from the SDN List, *id.* at 26–29. The Court addresses each in turn.

**A.**

First, Luka criticizes OFAC's interpretation of the legal standard in EO 13304. *Id*. at 16. The order states that OFAC may sanction an individual if he "actively obstructed, or pose[s] a significant risk of actively obstructing," the Dayton Accords or the Conclusions of the Peace Implementation Conference. *See* EO 13304 § 3. Luka focuses on the word "obstructs." His criticism of his brother's trial cannot count as obstruction, Luka says, because OFAC can sanction an individual for his speech only if that speech presents a "clear and present danger." Pl.'s Mem. at 16.

To reach this conclusion, Luka contends the Court should read First Amendment principles into the word "obstructs." *See id.* at 16–17. He relies on several Supreme Court cases holding that the government may punish individuals for obstructive speech only when that speech presents a "clear and present danger." *Id.* Luka concedes that as a Serbian national with no connections to the United States, he has no U.S. constitutional rights. *Id.* at 18; *see also Bazzi v. Gacki*, 468 F. Supp. 3d 70, 77 (D.D.C. 2020) ("[N]ot everyone everywhere has rights under our Constitution. And foreign nationals do not suddenly acquire constitutional rights whenever the United States sanctions them.").

But Luka says he is not advancing a First Amendment claim. Instead, he maintains that "[m]any parameters of our laws in the United States incorporate principles of the U.S. [C]onstitution in their definition." Pl.'s Mem. at 18. There is, Luka claims, "no jurisprudential support for the existence of two concepts of the term 'obstruction'—one for U.S. citizens and one for non-U.S. citizens." *Id.* at 19. Thus, the word "obstructs" in EO 13304 must incorporate the constitutional understanding of obstruction.

Luka's argument encounters several difficulties. Start with the cases he cites. In each, the Supreme Court relied on the "clear and present danger" standard to assess whether the state could punish speech *otherwise protected by the First Amendment*. *See Bridges v. California*, 314 U.S. 252, 262 (1941) (describing the "clear and present danger" standard as providing "practical guidance in a great variety of cases in *which the scope of constitutional protections of freedom of expression was in issue*") (emphasis added); *Pennekamp v. Florida*, 328 U.S. 331, 335 (1946) (examining whether certain statements carried "a threat of clear and present danger . . . or whether they [were] of a character which the principles of the First Amendment . . . protect"); *Craig v. Harney*, 331 U.S. 367, 373 (1947) (describing the case as one where the petitioners asserted they had been "deprived by a State court of a fundamental right secured by the Constitution"); *City of Houston v. Hill*, 482 U.S. 451, 461 (1987) (noting, in its discussion of the clear and present danger standard, that the "First Amendment protects a significant amount of verbal criticism and challenge directed at police officers").

Luka's authorities reveal that the "clear and present danger" standard is relevant only when the First Amendment is implicated. But this case does not implicate First Amendment principles because he has no constitutional rights. *See Agency for Int'l Dev. v. Alliance for Open Society Int'l*, 140 S. Ct. 2082, 2089 (2020) ("[F]oreign citizens outside U.S. territory do not possess rights under the U. S. Constitution[.]"). Because Luka has no First Amendment rights, the "clear and present danger" standard does not apply to him.[3]

[3] Since OFAC does not argue otherwise, the Court assumes without deciding that the "clear and present danger" test is still good law. *But see United States v. Viefhaus*, 168 F.3d 392, 397 n.3 (10th Cir. 1999) ("The 'clear and present danger' test . . . has been replaced by the 'incitement' test developed in *Brandenburg* [*v. Ohio,* 395 U.S. 444 (1969).]").

Luka tries an end-run around *Agency for International Development* by asking the Court to focus on the letter President Bush used to transmit the executive order to Congress. The letter characterizes EO 13304 as targeting "extremists" who "obstruct efforts to build peace and stability." Pl.'s Mem. at 20. Although Luka admits that adding his name to the SDN List in 2003 "fell within the conduct sought to be addressed by E.O. 13304," continuing to sanction him now for criticizing his brother's trial "falls far outside the conduct described in the letter and EO 13304." *Id.* at 21.

Perhaps so. But that is a distinct argument. Whether OFAC improperly refused to delist Luka because circumstances have changed does not affect the definition of "obstruction." Luka's argument thus does not advance his contention that the Court should import First Amendment principles here.

More, had the President wanted to incorporate First Amendment principles, he could have. *Accord Deripaska v. Yellen*, No. 19-CV-00727 (APM), 2021 WL 2417425, at *7 (D.D.C. June 13, 2021) ("Had the President wanted to incorporate [Plaintiff's proposed standard] into E.O. 13661, he would not have done so silently."), *aff'd*, No. 21-5157, 2022 WL 986220 (D.C. Cir. Mar. 29, 2022). And the President's decision not to incorporate these principles receives heightened deference because this executive order involves national security and foreign affairs. *See Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007) ("[O]ur review—in an area at the intersection of national security, foreign policy, and administrative law—is extremely deferential."). Finally, it is the "informed perspective *of the Executive Branch*" that matters for the meaning of obstruction.[4] Defs.' Reply at 10 (emphasis added), ECF No. 10; *see*

[4] Luka argues that the "ordinary *legal* meaning" of the term "obstruction" should control. Pl.'s Reply at 6, ECF No. 12. But he cites cases about *statutory construction*, not the interpretation of executive orders. *See id.* In any event, Luka's argument independently fails because he claims

*also Udall v. Tallman*, 380 U.S. 1, 4 (1965) ("The Secretary's interpretation [of an executive order] may not be the only one permitted by the language of the orders, but it is quite clearly a reasonable interpretation; courts must therefore respect it.").[5]

Even if Luka's statements could not qualify as "obstruction," OFAC relied on more than just his speech. It cited heavily to a report from the State Department that supported OFAC's decision to keep Luka on the SDN List. *See* AR at 13. Among other things, the Department's report found that:

- "[F]rom 1995-2007, Luka Karadzic actively and willingly provided material aid to his fugitive brother . . . Luka served as a leader in Radovan's assistance network and maintained contact with knowledge of the location of his brother while he was in hiding[.]" *Id.* at 94.

- "After the capture of Radovan Karadzic in 2008, the High Representative decided to continue blocking Luka Karadzic's bank accounts, as he was suspected of providing material support to other ICTY fugitives."[6] *Id.*

---

that using the "ordinary meaning" of the term "obstruction" reveals that it "is a legal term that does not include protected speech." *Id.* But Luka's speech is only "protected" if he has constitutional rights. As the Court has explained, he does not.

[5] Luka also invokes the Constitution of Bosnia and Herzegovina to argue that it protects freedom of expression just like the U.S. Constitution. Pl.'s Mem. at 19. But Luka cites no case suggesting that other countries' constitutions bind OFAC. In similar contexts, courts have found that foreign law does not bind it. *See, e.g.*, *Fulmen Co. v. OFAC*, 547 F. Supp. 3d 13, 24 (D.D.C. 2020) ("OFAC is certainly not bound by other countries' decisions to sanction or not sanction particular individuals and entities. It is tasked with protecting the national security, foreign policy, and economic interests of the United States[.]").

[6] Luka points out that the High Representative removed its sanctions in 2011. Pl.'s Mem. at 25. But this is not dispositive because other countries and international bodies might have different foreign policy goals than the United States. More, they might be making these decisions on different records and under different standards of review. *See, e.g.*, *Kadi v. Geithner*, 42 F. Supp. 3d 1, 13 (D.D.C. 2012) ("[T]he Court would . . . be reluctant to rely on the decisions of other countries based on information that likely differed from the administrative record compiled by and available to OFAC. Moreover, these decisions may have been reached under different standards of proof or review, which further undermines any persuasiveness they would have."). What is relevant here is whether OFAC reasonably considered the High Representative's decision. *See Pub Citizen*, 796 F.2d at 1495. It did. *See* AR at 4–17.

- "Luka Karadzic has failed to distance himself in any way from the legacy of his brother's wartime atrocities. Instead . . . Luka Karadzic has disputed the factual accuracy of evidence presented against his brother and has asserted that the ICTY is generally unfair, political, and biased." *Id.* at 96.

- "As recently as 2017, Luka expressed no remorse over his failure to provide information leading to the arrest and capture of his brother during his twelve years on the lam, noting he was unmoved by the U.S.-offered reward of $5,000,000." *Id.*

- "Luka Karadzic continues to occupy a significant place in political life in the region from which he could amplify alternative histories and destabilizing narratives that undermine the international community's work to advance rule of law in Bosnia and Herzegovina and the Western Balkans writ large. These narratives are already enjoying a resurgence." *Id.*

Recall that the Court's role is to examine whether OFAC's actions "were based on substantial evidence." *Holy Land Found.*, 333 F.3d at 162. "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Univ. Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). OFAC has met that standard here. It permissibly relied on Luka's statements and actions as well as an assessment from the State Department. This constitutes substantial evidence.[7]

**B.**

Next, Luka argues that OFAC's decision not to delist him was "arbitrary and capricious on the facts." Pl.'s Mem. at 23. Luka reprises his previous claim that mere criticism of a legal process cannot count as obstruction. He highlights other public figures who have criticized the legal system without reprisal. For example, then-Secretary of State Mike Pompeo called the

---

[7] Luka urges the Court to rely on *Epsilon Elecs., Inc. v. OFAC*, 857 F.3d 913, 928 (D.C. Cir. 2017). *See* Pl.'s Mem. at 22–23. At issue there was whether Epsilon knew certain shipments were headed for Iran. *Epsilon Elecs.*, 857 F.3d. at 916. The Circuit found OFAC failed to explain its conclusions "in light of the countervailing evidence." *Id.* at 927. Luka claims this applies here because OFAC "never considered or explained how Luka's public statements presented a clear and present danger to the Dayton Accords." Pl.'s Mem. at 23. This argument can succeed only if OFAC had a responsibility under the "clear and present danger" standard. Because the Court finds OFAC was under no such obligation, Luka's argument fails.

International Criminal Court a "kangaroo court." *Id*. at 23–24. George Floyd's brother, testifying before Congress, described the police's actions toward his brother as "a modern-day lynching in broad daylight." *Id.* at 23. He wondered "whether police might kill him next." *Id.* at 24. And the brother of Ghislaine Maxwell stated her trial "was not [] fair." *Id.* at 24.

Luka argues that criticism of the judicial system does not, without more, obstruct it. *Id.* And when, as here, the person doing the criticizing is a family member of the accused, his statements have "a bias that is apparent to the reader." *Id.* Finally, Luka contends that OFAC relied heavily on prior findings of the High Representative even though the High Representative removed all sanctions from him in 2011. *Id.* at 25. So too should OFAC, says Luka. A failure to do so would be arbitrary and capricious given how common it is for public figures to criticize the justice system. No one suggests these other public figures obstructed justice.

To be sure, if Luka were a U.S. citizen supporting a brother targeted by the criminal justice system by railing against that system, the First Amendment would likely shield him. But comparisons to domestic affairs do little to advance Luka's position in a case involving foreign affairs—an area where courts grant the Executive substantial deference and the Bill of Rights has little applicability. *See Chicago & S. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 111 (1948) ("[T]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative."); *see also Islamic Am. Relief Agency*, 477 F.3d at 734. By the same token, if the Executive Branch decides the Secretary of State should criticize the International Criminal Court and yet OFAC should sanction Luka for criticizing a different court, this Court will not intervene absent substantial evidence the decision was arbitrary and capricious.

No such evidence exists here. As described above, there is substantial evidence that OFAC weighed the evidence before it and reasonably relied on it. For example, OFAC found that Komotko, Luka's gas company, was part of the network supporting Radovan "and other war criminals on the run from the Hague Tribunal." AR at 11. It also found that Luka and Radovan were in communication during Radovan's time in hiding, further buttressing its conclusion that Luka aided Radovan. *Id.* It stated that Luka's criticism of the Hague Tribunal that indicted his brother as well as his appearance at a nationalist rally undermined the delicate balance of peace in the region. Defs.' Reply at 13; *see also* AR at 11–13. Luka's position of prominence in the region was an especially relevant factor in OFAC's analysis. *See* AR at 13. Finally, OFAC relied on the State Department's advisory memorandum, which made many findings about Luka's support of his brother. *See supra* Section III.A.

Considering this record, OFAC did not act arbitrarily and capriciously. The Court's role is to examine the record for "*substantial* evidence, not proof positive." *Pub Citizen*, 796 F.2d at 1495. And a court should not "reweigh the evidence and come to [its] own conclusion" but should "assess the reasonableness of [the agency]'s conclusion." *Id.* OFAC assembled sufficient evidence for its refusal to delist Luka and, as seen by its in-depth discussion in the administrative record, scrutinized that evidence. That is all the law requires of it.

**C.**

Finally, Luka contends that OFAC violated its own regulations by refusing to delist him despite changed circumstances. *See* Pl.'s Mem. at 26–29. He acknowledges EO 13304's use of the past tense when it says OFAC may sanction persons determined "to *have* actively obstructed" the Dayton Accords or the Conclusions of the Peace Implementation Conference. *See id*. at 26

(quoting EO 13304 § 3 (emphasis added)). But he says that OFAC's regulations require it to remove a designation when the reasons for the designation no longer apply:

> A person may seek administrative reconsideration of his, her or its designation or that of a vessel as blocked, *or assert that the circumstances resulting in the designation no longer apply*, and thus seek to have the designation rescinded pursuant to the following administrative procedures . . . .

31 C.F.R. 501.807 (emphasis added).

Luka's argument encounters two problems. *First*, the regulations do not say that OFAC *must* delist an individual when the original circumstances for the designation have changed. Instead, the regulations say that a designated individual "may" petition OFAC to remove the designation. This language does not conflict with EO 13304. Indeed, courts in this district facing similar challenges have likewise found that past conduct alone is sufficient for maintaining sanctions. *See, e.g.*, *Pejcic v. Gacki*, No. 19-CV-02437 (APM), 2021 WL 1209299, at *7 (D.D.C. Mar. 30, 2021) ("Pejcic need not be engaged in sanctionable conduct at the time his delisting petition is considered for OFAC to reasonably conclude that he should remain a sanctioned person.").

Nor is this surprising. Sanctions can serve various foreign policy goals. *See, e.g.*, *Olenga v. Gacki*, 507 F. Supp. 3d 260, 281–82 (D.D.C. 2020) ("[T]he President has broad authority under IEEPA and could reasonably conclude that the deterrence of international bad actors, at least at times, requires the imposition of sanctions on those who have retired or moved on to other pursuits. Such a determination is precisely the type of judgment that is properly left to the President and his advisors[.]"). Those goals sometimes change as circumstances change. It is not unreasonable that sanctions could maintain their usefulness even if the original reasons for

implementing them no longer apply. The Court will not second guess the Executive's permissible policy judgments in this area.

*Second*, OFAC did not rest only on historical evidence. It relied on recent conduct, too. For example, it referenced a 2019 media report that revealed Luka denied Radovan had genocidal intentions. *See* AR at 12. In the same story, he called Radovan's verdict an "awful and huge injustice." *Id.* A separate story, also published in 2019, said Luka called the Hague Tribunal "illegitimate and illegal." *Id.* Finally, the State Department reported that in 2017 Luka said he was "was unmoved by the U.S.-offered reward of $5,000,000." *Id.* at 96. This recent conduct provides OFAC an independent basis to continue the sanctions.

## IV.

Perhaps this was a close call for OFAC. Luka rightly argues that many of OFAC's justifications for sanctioning him would be problematic if he were an American. And, as he notes, much has changed in the years since OFAC designated him.

But it is not a close call for this Court. The standard of review in the APA context is not demanding. This is especially true when the actions under review involve foreign affairs and national security. OFAC meets that standard. Congress granted wide latitude over sanctions to the Executive; it is not for the courts to say otherwise.

For all these reasons, the Court will grant OFAC's motion for summary judgment and will deny Luka's motion. A separate Order will issue.

2022.05.06
11:38:57 -04'00'

Dated: May 6, 2022

TREVOR N. McFADDEN, U.S.D.J